UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| CULTURAL LANDSCAPE GROUP: FLAT ROCK,<br><br>P.O. Box 1675<br>Flat Rock, NC 28731<br><br>ANNE COLETTA AND PAUL COLETTA<br><br>417 Rhett Drive<br>Flat Rock, NC 28731<br><br>            Plaintiffs,<br>v.<br><br>VILLAGE OF FLAT ROCK, MAYOR ROBERT STATON, SIGN ENFORCEMENT OFFICER PATRICIA CHRISTIE<br><br>110 Village Center Drive<br>P.O. Box 1288<br>Flat Rock, NC 28731,<br><br>           Defendants. | **CIVIL ACTION**<br>Enter number here<br><br>Jury Trial Demanded |

**COMPLAINT**

Plaintiffs Cultural Landscape Group: Flat Rock ("CLG"), and Anne and Paul Coletta (collectively "Plaintiffs"), by and through their counsel, bring this Complaint against Defendants Village of Flat Rock, North Carolina ("Flat Rock" or the "Village"), Mayor Robert Staton ("Mayor Staton"), and Sign Enforcement Officer Patricia Christie (the "SEO," "Sign Enforcement Officer" or "Defendant Christie" and, collectively with the Village, "Defendants"). In support, Plaintiffs allege as follows:

**INTRODUCTION AND NATURE OF THE ACTION**

1. This case is about Defendants' efforts to prevent fundamental political speech by the Plaintiffs, in violation of the First and Fourteenth Amendments. In January 2018, a group of citizens

banded together and formed CLG to, among other things, oppose a proposed overhaul of the North Highland Lake Road (the "Construction Project"). That Project would substantially alter a central road that is one of the scenic gateways of the historic Village of Flat Rock. As part of this effort, CLG members created yard signs to display their political opposition in a meaningful, yet cost-effective manner. Their grassroots advocacy campaign successfully attracted attention and initiated vigorous public discussion and debate over the propriety of expanding the road. For example, CLG garnered over 1,600 signatures in opposition to the Construction Project by means of a local petition.

2. While CLG's signs were effective at motivating public opposition to the highway construction project, they also drew the scrutiny of Village leadership. The Village has a sign ordinance that regulates signs differently based on the content of the signs. Thus, for example, "advertisements" are treated differently than "directional signs," and "directional signs" are treated differently than "Political signs." In January 2018, the Sign Enforcement Officer contacted CLG leadership declaring the content of the group's signs made them "advertisements," and thus, they were improperly displayed in a residential district and must be removed. CLG responded that the Sign Control Ordinance's content-based regulations violated the Constitution. The Village took no further action at that time.

3. Over CLG's protest that the Sign Control Ordinance was unconstitutional for its content-based regulations, the Village Council, led by Mayor Robert Staton, amended the Sign Control Ordinance in December 2018 in a targeted effort to broaden the definition of "Political signs" to include CLG's signage. Pursuant to the December 2018 amendments, the Sign Control Ordinance now requires signs related to an *issue* upon which voters or a legislative body *may vote* to be removed within three days after a vote. Despite the fact that concerns about the Construction Project remain, Mayor Staton and the Sign Enforcement Officer claim the recent amendment requires CLG and its members to remove their signs or suffer fines. The Village's Sign Enforcement Officer, as a result, issued Notices of Violation in April 2019 to members of CLG and other village residents who continued advocating against the Construction Project. Threatened with substantial fines, members of CLG removed their signs.

4. CLG, the Colettas, and members of the Flat Rock community continue to advocate against projects and other actions that would alter the historic nature of Flat Rock. The Sign Control Ordinance, however, effectively eliminates one of the most cost-effective methods of political advocacy—residential signs. The Village, through Mayor Staton, offered pretextual interests in safety, property values, and community aesthetics to justify this result, even though the Sign Control Ordinance and the selective enforcement thereof leaves substantial damage to those interests unchecked. Thus, after nearly eighteen months and several rebuffed attempts to persuade the Village Council and Mayor Staton to amend a sign ordinance filled with content-based restrictions on speech, a prior restraint, and vague, overbroad language, CLG and its members are now compelled to file suit.

## JURISDICTION AND VENUE

5. This action arises under the First and Fourteenth Amendments to the United States Constitution, as well as federal law—including 28 U.S.C. § 2201 and 42 U.S.C. §§ 1983 and 1988.

6. This Court has original jurisdiction over these claims under Constitutional and federal law pursuant to the authority granted by 28 U.S.C. §§ 1331 and 1343.

7. Pursuant to 42 U.S.C. § 1983 and Federal Rule of Civil Procedure 65, this Court has authority to grant preliminary and permanent injunctive relief.

8. Pursuant to 28 U.S.C. § 2201, this Court has authority to declare the legal rights of a party with the force and effect of a final judgment.

9. This Court has personal jurisdiction over the Village of Flat Rock because the Village is a municipality located within the State of North Carolina.

10. This Court has personal jurisdiction over Patricia Christie because she, upon information and belief, resides in the State of North Carolina.

11. This Court has personal jurisdiction over Mayor Robert Staton because he, upon information and belief, resides in the State of North Carolina.

12. The events giving rise to the claims specified herein occurred and are occurring within the geographic bounds of the United States District Court for the Western District of North Carolina; venue is therefore proper under 28 U.S.C. § 1391(b).

## PARTIES

13. Plaintiff Cultural Landscape Group:Flat Rock is an unincorporated association formed in 2018 and is located within the Western District of North Carolina.

14. The stated mission of CLG is "[t]o preserve the cultural landscape of Flat Rock in a way that reflects the character and history of the area."

15. CLG and its members sought and seek to advocate for and against construction and other projects around the Village depending on how the projects would affect the Village's character.

16. CLG had 77 registered members during the period of July 1, 2018 through June 30, 2019, most of whom who are residents of or property owners in Flat Rock.

17. Of these, at least 21 placed signs on their property during the period covered by the allegations set forth below. And at least five members of CLG (along with four other residents of Flat Rock who placed CLG signs in their yards) were noticed violations of the Sign Control Ordinance in April 2019 and subsequently removed their signs.

18. Plaintiff Anne Coletta is the President of CLG. She served as a member of the Flat Rock Village Council (the "Village Council") from 2013–2017.

19. Plaintiff Paul Coletta is a board member of CLG.

20. Anne and Paul Coletta have actively joined CLG in opposing construction projects that would negatively affect the historic and cultural landscape of Flat Rock, including proposed updates to the North Highland Lake Road.

21. CLG, the Colettas, and other similarly situated individuals continue to advocate against projects that would negatively affect the character of Flat Rock, including proposed projects like the North Highland Lake Road project.

22. Defendant Village of Flat Rock is a legal entity capable of suing and being sued in its incorporated name.

23. The Village of Flat Rock has a Village Council made up of representatives from three districts.

24. The Village also has a Mayor and Vice Mayor who participate in Village Council meetings and advise the Village Council.

25. The current mayor is Robert Staton. Mayor Staton is a former attorney. Mayor Staton is sued in his official and individual capacities.

26. The Village Council, with advice from Mayor Staton, approved and instituted the Sign Control Ordinance, including recent amendments dated December 13, 2018.

27. The Village's Sign Enforcement Officer, Defendant Patricia Christie, is tasked with enforcing the Sign Control Ordinance. In some cases, enforcement has included removing signs or issuing notices of violation. Defendant Christie is sued in her official capacity.

28. Defendant Christie enforced the 2018 amended Sign Control Ordinance when, on April 16, 2019, she mailed Notices of Violation to members of CLG and other village residents demanding they remove signs from their property or be subject to fines.

29. Defendant Christie is currently tasked with enforcing the Sign Control Ordinance in her discretion.

30. The Village, Defendant Christie, the Village Council, and Mayor Staton sanction the enforcement of the Sign Control Ordinance against CLG and its members.

31. Upon information and belief, the Village, Defendant Christie, the Village Council, and Mayor Staton intend to continue enforcing the Sign Control Ordinance against CLG, its members, and all those residents of the Village who attempt to utilize signage to engage in protected speech.

## FACTS

### A.  CLG's Opposition to the North Highland Lake Road Project

32. The Village of Flat Rock has just over 3,300 residents and is included on the National Register of Historic Places.

33. Members of CLG seek to preserve the historic character of the Village, including through opposition to projects that would negatively the cultural landscape of the Village.

34. In early 2016, the Village Council began consideration of a project to overhaul a one mile stretch of road cutting through the Village, the North Highland Lake Road (S.R. 1783).

35. Once the North Carolina Department of Transportation ("NCDOT") approved the Construction Project, the Village Council, in conjunction with NCDOT, began consideration of the contours of the updates.

36. The Construction Project included (among other things) widening and straightening the North Highland Lake Road and the construction of bike and pedestrian paths, which would result in the removal of greenery along the roadway.

37. Many Flat Rock citizens opposed the alterations that the construction would have on the Villages' historic character.

38. For example, at NCDOT's October 2017 public meeting attended by 158 people, 97 comments voiced opposition to the plan. Of the 97 comments in opposition, 46 comments raised concerns that the Project would impact Flat Rock's natural features and 24 comments raised concerns that construction of the Project could negatively affect the historical and cultural identity of the area.

39. At the meeting, those opposed to the plan noted specific concerns, including: (a) the certain destruction of trees along North Highland Lake Road; (b) the impending increase in traffic resulting from the widened road; and (c) increased parking near a local waterfall and in the local park.

40. In response to such concerns, members of CLG began petitioning the Village Council at council meetings to reject the Construction Project.

41. By early 2018, CLG members also began placing signs in their yards protesting the Construction Project.

42. The goal of these signs was two-fold: oppose the Construction Project and raise awareness of the increasing efforts to change the historical identity of Flat Rock.

43. The signs (examples of which are shown below) contained messages including:

    - "Keep Big Rigs Out"
    - "Save Our Scenic Byways"
    - "Don't Urbanize Flat Rock"
    - "Keep Flat Rock Green"





44. CLG also circulated a petition opposing the Construction Project, which garnered approximately 1,668 signatures from members of the local community.

45. CLG along with other community members presented these signatures and their opposition to the Village Council on several occasions, while the growing opposition garnered public attention.

46. As one newspaper article noted at the time, the "proposed Highland Lake Road project turned the usually sedate Flat Rock Village Council meetings into jam-packed public forums filled with project opponents."

### B. Attempted Regulation of CLG's Signage

47. Under the Original Sign Control Ordinance ("Original Ordinance"),[1] "Advertising" was defined as "[a]ny writing, painting, display, emblem, drawing, sign or other device designed or intended to be used for display or any type of publicity for the purpose of making anything known or attracting attention to a place, product, goods, services, idea or statement."

48. The Original Ordinance defined a "Political sign" as "[a] sign designed to indicate the support of or opposition to a candidate, issue or proposition upon which voters may vote."

49. The Original Ordinance did not address signs designed to indicate support or opposition to an issue or proposition upon which *a legislative body may vote*, such as the Construction Project.

50. The Original Ordinance regulated Political signs, but did not subject them to a permit requirement.

51. However, the Original Ordinance only permitted Political signs to be raised on the last day "a candidate must file with the state or Henderson County Board of Elections" and taken down "within three days after any primary election day as to an unsuccessful primary candidate and within three days after any general election as to all other candidates."

52. After CLG posted signs protesting the Construction Project, and complaints were made to the Village Administrator Judy Boleman, Ms. Boleman informed CLG President Anne Coletta that its members' signs were ostensibly "Advertising" signs because they displayed "an idea or statement." Advertising signs are prohibited in residential areas.

53. According to Ms. Boleman the signs could not qualify as Political signs because the Original Ordinance defined "Political signs" to include only those signs regarding an "issue or proposition **upon which voters may vote**."

54. The North Highland Lake Road project was not an "issue or proposition upon which voters may vote" because only the Village Council would vote to approve or reject the Construction Project.

55. Absent a provision permitting the display of the signs, Ms. Boleman explained, all signs related to the Construction Project were advertising signs and could not lawfully be displayed in residential areas.

56. Ms. Boleman invited Anne Coletta and another member of CLG to show her a provision that permitted CLG's signs.

---

[1] The Original Ordinance of the Village of Flat Rock is attached to the Mancuso Declaration as Exhibit 1.

57. Ms. Coletta attempted to show Ms. Boleman the signs were in fact Political signs.

58. Upon consulting with the Village's attorney, Ms. Boleman concluded the signs were advertising signs in violation of the then-existing sign ordinance, and must be taken down because they were "inconsistent with the objectives of the [sign control ordinance]."

59. CLG responded to Ms. Boleman stating the following[2]:

> "Based on several U.S. Supreme Court decisions [for example City of Ladue v. Gilleo, 512 U.S. 43, 114 S. Ct. 2038 (1994) and Reed v. Town of Gilbert, 576 U.S. __ (2015)], we think these signs should be allowed. For instance, the village sign control ordinance does not seem to be content-neutral: by permitting yard signs for the real estate and construction industries but not for private property owners using a First Amendment right on their property, certain groups have been given precedence—and those preferred groups don't appear to include citizens expressing their political viewpoints. We think this is unconstitutional and should be corrected."

60. On January 23, 2018, Ms. Boleman notified CLG that she would be "pulling any sign that is within ten feet of the traveled way," and then she would "follow the regulations as outlined in the ordinance for the remainder of the signs that are beyond ten feet from the edge of the traveled way," including sending a notice of violation and giving property owners 30 days to remove the signs.

61. Ultimately, no notices of a violation were distributed to property owners at this time.

62. Council member John Dockendorf then reached out to Ms. Coletta to inquire about what changes to the Sign Control Ordinance were necessary to avoid a dispute.

63. Ms. Coletta suggested "using as examples municipalities that have gone through that process" of drafting an ordinance to "com[e] up with language that reflects the legal parameters of free speech based on U.S. Supreme Court cases."[3]

64. Ms. Coletta noted the "biggest issue" is the Original Ordinance is not "content-neutral" and "the language really needs an attorney who knows all the issues."

65. Ms. Coletta then forwarded her correspondence regarding the constitutionality of the sign ordinance with Ms. Boleman to the Village Council, once again advocating for amendment.

66. Despite these statements encouraging amendment of the sign ordinance to comply with the Constitution, no changes were implemented at that time.

---

[2] Correspondence between Ms. Boleman and Plaintiff Anne Coletta is attached to the Mancuso Declaration as Exhibit 2.
[3] Plaintiff Anne Coletta's email response is attached to the Mancuso Declaration as Exhibit 3.

67. Ms. Coletta subsequently contacted the Village Council and Mayor Staton forwarding Ms. Boleman's decision as well as her response regarding the unconstitutionality of the sign ordinance.

68. Once again no change was made to the Original Ordinance, and instead the Village Council and Mayor Staton disregarded the sizable opposition to the Construction Project. On June 19, 2018, by a vote of 5-1, the Village Council approved the project subject to certain conditions.

69. At a July 12, 2018, Village Council meeting—after the Council's vote in favor of the Construction Project but before construction began—Council member Ginger Brown stated she and the new sign enforcement officer, Defendant Christie, would begin removing CLG's signage from the right of way.

70. In addition, Council Member Brown stated she and Defendant Christie would begin citing property owners who continued to keep signs displayed on their land.

71. Several members of CLG and other village residents refused to take down their signs.

72. They did so because the Construction Project, although approved by the Village Council, was still subject to multiple conditions before it could begin, and CLG and its members believed continued advocacy could still affect the viability of the project.

73. Ultimately, no notices of violations were issued.

### C. Amendments To The Sign Control Ordinance And Subsequent Enforcement

74. At a September 12, 2018, Planning Board Meeting, amendments to the Sign Control Ordinance were proposed by Mayor Staton to the Flat Rock Planning Board, with certain of the amendments targeting CLG's signage. The Planning Board approved the amendments.

75. At the October 11, 2018, Village Council meeting, Mayor Staton stated there were draft amendments pending his and the Village's local attorney's review.

76. Subsequently, on December 13, 2018, the Village Council held a public hearing and vote on these amendments to the Village's Sign Control Ordinance.

77. The proposed changes included the following amendments:

    - (1) adding language to the definition of Political sign to include those signs that regard issues or propositions upon which members of a public legislative body may vote;

    - (2) reducing the permitted size of a Political sign from 16 to four square feet; and

    - (3) adding the following language to the regulation of Political signs, "Signs relating to issues or propositions upon which members of a public body may vote must be removed within three days following the date upon which members of the public

legislative body take a final vote on the issue or proposition or table the matter without further consideration or vote."

78. A CLG member attending the public hearing advised the Village Council on behalf of CLG that the language was unconstitutional.

79. Nonetheless, the Village Council ignored CLG's advisement and unanimously voted to approve the amendments.[4]

80. After the amendments were passed, Mayor Staton was quoted in a January 2, 2019, news article stating: "We've been trying to get [the sign ordinance] amended since last May or June when we first started getting complaints but I thought it was premature to attack those signs when there was a legitimate issue that a number of people were concerned about."[5]

81. The amendments were passed in an effort, upon information and belief, to target CLG and its members in order to force them to remove their signs.

82. Since the amendments, the Sign Control Ordinance has been enforced selectively against CLG members over others posting noncompliant signs.

83. For example, Village Council member John Dockendorf maintained on his property a sign stating "Hate Has No Home Here" (see image below).

---

[4] The Amended Sign Ordinance is attached to the Mancuso Declaration as Exhibit 4.
[5] The news article is attached to the Mancuso Declaration as Exhibit 5.



84. Because of the content of this sign no provision in the Village's Sign Control Ordinance allows its display, absent a permit, yet it has remained.

85. Upon information and belief, this and other signs in the Village have been allowed to remain on display despite their content, as long as no complaint is transmitted to the Sign Enforcement Officer.

86. Nevertheless, CLG's signs were targeted for enforcement, in part, because of complaints received regarding the groups' signs.

87. In the January 2, 2019 news article Mayor Staton referred to complaints received about CLG "littering our streets with signs that say 'Keep the big rigs out' and all that nonsense from the opposition to the Highland Lake Road improvement project" as motivation for the amendments.

88. These amendments are selectively enforced against CLG and its members, while others, such as Village Council member John Dockendorf, are permitted to maintain signs on their property in violation of the Amended Ordinance.

89. Following the passage of the amendments to the Sign Control Ordinance, upon information and belief, some members of CLG removed the signs from their property for fear of fines.

90. On April 16, 2019, CLG and those individual members with signs still placed in their yards received notices entitled "Notice of Violation—Order to Cease Violation." [6]

91. The Notices informed CLG and the individual members that "based on the sign's messages" the remaining signs were displayed in violation of the Village's Sign Control Ordinance.

92. The Notices continued that "[b]ecause of their messages", the signs qualified as "political signs" under the Amended Sign Ordinance, and therefore should have been removed nearly nine months earlier, after the Village Council approved the Construction Project.

93. Failure to remove the signs within 30 days, the Notices warned, would result in a civil penalty. The civil penalty included fines accruing of $10 per day for the first 30 days after imposition of the penalty and $100 per day thereafter.

94. Upon information and belief, no Flat Rock residents outside of CLG's membership and those who posted CLG's signs received Notices of Violation under the amended Ordinance at this time.

95. Shortly after the notices were served, the Village Newsletter, a local publication circulated to all Flat Rock property owners, alerted the community that the Notices of Violation had been issued. [7]

96. The article, authored by Mayor Staton, explained that "[b]ecause of their messages" the signs were considered "political signs" under the sign ordinance and must be taken down.

97. The article justified the adoption of the amendments to the sign ordinance, explaining the "village council, in adopting the ordinance, considered the impact of signs on community aesthetics and the surrounding neighborhoods."

98. The article added that CLG's signs had been "long considered by members of the village council and others to be a blight on the village's scenic byways . . . far more aesthetically detrimental to the village than the harm they [CLG] falsely claimed would come to the village's historic character if the NCDOT plan was implemented."

99. The article did not identify any safety justification behind the provisions that regulate signs based on their political message.

100. Similarly, upon information and belief, neither Mayor Staton nor the Village Council have ever offered any safety justification behind the provision regulating signs based on their political message.

101. On May 16, 2019, representatives of CLG—Anne and Paul Coletta—submitted a request to Mayor Staton seeking a two-week extension of the date by which fines would begin accruing based on the Notices of Violation. [8]

---

[6] The Notice to CLG is attached to the Mancuso Declaration as Exhibit 6 and to Ms. Rindal as Exhibit 7.
[7] A copy of the April 2019 Village Newsletter is attached to the Mancuso Declaration as Exhibit 8.
[8] The request is attached to the Mancuso Declaration as Exhibit 9.

102. The request explained that CLG was seeking legal counsel and an extension would be beneficial while the matter was under consideration.

103. On May 20, 2019, as representatives of CLG—Anne Coletta—received a response from Mayor Staton denying their request for an extension.[9]

104. Mayor Staton explained the time "to notice an appeal" of the citation had passed and an extension of time was only available "<u>to remedy a violation</u>" (emphasis in original).

105. The Mayor noted that the request of additional time, "not to remedy the violations, but to retain counsel to fight the village's notice of violations," was not a valid reason to extend the time limit.

106. Mayor Staton acknowledged "that those displaying the signs had the right to do so as an exercise of their first amendment free speech right," at least for a time and for a legitimate reason.

107. Since the Construction Project had already been voted on, however, Mayor Staton could not understand why CLG's signs needed to remain on their properties. He stated: "Why you and the handful or so who still have the signs on display think it is important that they remain is beyond me."

108. The Mayor concluded asking how "members of [CLG] think that your fight with the village over an assumed right to continue the display of the offending signs that many consider to be a blight on the village further (sic) that mission? And to what personal expense are they willing to go, and to what expense in taxpayer dollars are they willing to put Flat Rock citizens, to pursue the fight?"

109. The Construction Project had not yet begun when Mayor Staton responded.

110. In response, on May 29, 2019, CLG and the Colettas, represented by counsel, contacted the Mayor and Village Council via letter.[10]

111. In that response, CLG and the Colettas once again informed the Mayor and Village Council of the unconstitutionality of the Amended Ordinance, including its improper restriction on CLG and its members' ability to meaningfully speak.

112. The response also requested any accrued fines be expunged and the ordinance be amended to comply with the Constitution.

113. Subsequently, Mayor Staton informed the Village Council at a meeting held on June 13, 2019, that "Anne [Coletta's] attorney has demanded that, among other things, the council repeal those rules [i.e. the sign ordinance] immediately, so she or anyone else who

---

[9] The Mayor's response is attached to the Mancuso Declaration as Exhibit 10.
[10] That response is attached to the Mancuso Declaration as Exhibit 11.

desires, can without restraint, put up any kind of sign, of any size and color, saying anything they want, anywhere in Flat Rock."[11]

114. CLG and the Colettas never requested that the Village Council repeal the sign ordinance. Nor did they request that signs be permitted without regulation.

115. CLG and its members have never intimated a desire "put up any kind of sign, of any size and color, saying anything they want, anywhere in Flat Rock."

116. CLG and its members seek to exercise their First Amendment rights to the fullest extent guaranteed to them by the Constitution.

117. Issues affecting the cultural and historic character of Flat Rock continue to arise, including other construction projects.

118. CLG and its members continue to oppose efforts, such as construction projects, that negatively affect the character of the Village.

119. CLG and its members still desire to place signs on their property voicing opposition to the Construction Project.

120. In light of Mayor Staton's comments and the amendments to the Sign Control Ordinance, CLG members fear that utilizing signage to publicize their opinions will lead to unwarranted penalties.

121. CLG and its members have chosen not to utilize signage to advance the organization's interests in maintaining the character of the Village because of this concern.

## COUNT I

### Violation of the Free Speech Clause (All Defendants under 42 U.S.C. § 1983)

122. Plaintiffs re-allege and incorporate by reference each and every allegation contained in the paragraphs above, as if fully set forth herein.

123. The Free Speech Clause of the United States Constitution's First Amendment states "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I.

124. The Free Speech Clause is enforceable pursuant to 42 U.S.C. § 1983 and applicable to state and local laws by virtue of the Fourteenth Amendment.

125. Plaintiffs' signs are protected speech under the First Amendment as political speech on CLG members' own properties.

126. The Sign Control Ordinance abridges Plaintiffs right to engage in protected speech based on the content of that speech.

---

[11] The newspaper article containing this quote is attached to the Mancuso Declaration as Exhibit 12.

127. Signs with different, commercial, or unprotected messages are treated differently and/or more favorably than CLG's Political signs based on the content of those signs.

128. The Sign Control Ordinance treats commercial speech more favorably than noncommercial speech.

129. The Sign Control Ordinance discriminates against certain speech based on the content of that speech, and therefore is subject to strict scrutiny.

130. Through the Sign Control Ordinance, Defendants have deprived CLG and Anne and Paul Coletta, along with other residents of Flat Rock, of their right to engage in protected speech in violation of the First Amendment's Free Speech Clause.

131. The Sign Control Ordinance is not narrowly tailored to further a compelling government interest.

132. The Amended Ordinance identifies safety, aesthetics, and the preservation of property values as interests justifying the regulation of signs. To date, however, the Village Council and Mayor Staton have only identified aesthetics and property values as the governmental interests specifically served by the unique treatment of Political signs.

133. These concerns are not compelling interests.

134. The Village has no other compelling interests.

135. The differential treatment of signs based on their content permits substantial harm to the Village's interests.

136. The Sign Control Ordinance, therefore, cannot be justified on the basis of aesthetic considerations or any other governmental interest.

137. The Sign Control Ordinance is not narrowly tailored to further any other governmental interest.

138. The Sign Control Ordinance is facially, and as applied to Plaintiffs, unconstitutional.

139. All individuals within the limits of the Village of Flat Rock are subject to the prohibitions of the Sign Control Ordinance with no available and ample alternative channels for communication or protected speech.

140. The Sign Control Ordinance grants public officials unbridled discretion based on ambiguous and subjective grounds, such that no objective criteria constrain those officials' ability to limit speech. As a result, the Ordinance also imposes an unconstitutional prior restraint in violation of the First Amendment.

141. The Sign Control Ordinance also violates the First Amendment by elucidating no objective grounds for distinguishing between permissible and impermissible speech in a non-arbitrary, viewpoint-neutral manner.

142. As a direct and proximate result of Defendant's violation of the Free Speech Clause, Plaintiffs have suffered and will continue to suffer irreparable harm by virtue of the deprivation of their constitutional rights.

## COUNT II

**Violation of the Free Speech Clause (Overbreadth) (All Defendants under 42 U.S.C. § 1983)**

143. Plaintiffs re-allege and incorporate by reference each and every allegation contained in the paragraphs above, as if fully set forth herein.

144. The Sign Control Ordinance, facially and as applied to Plaintiffs, is overbroad because it sweeps within its ambit a substantial amount of protected First Amendment speech.

145. Section 604 of the Sign Control Ordinance states "All signs, except as herein provided in Sections 601, 602 and 603, shall require a sign permit as provided in Article VIII."

146. As a result, all forms of political speech through signage are prohibited absent a permit, except those Political signs for a limited period, as set forth in Section 603:

147. "Signs relating to candidates for office may be erected no earlier than the last day on which a candidate must file with the state or Henderson County Board of Elections. The signs must be removed within three days after any primary election day as to an unsuccessful primary candidate and within three days after any general election as to all other candidates."

148. "Signs relating to an issue or proposition upon which voters may vote must be removed within three days after election day. Signs relating to issues or propositions upon which members of a public body may vote must be removed within three days following the date upon which members of the public legislative body take a final vote on the issue or proposition or table the matter without further consideration or vote."

149. These provisions limit substantial amounts of protected speech by subjecting political speech signs on a citizen's property to permit requirements outside a narrow time period.

150. Property owners in Flat Rock may not utilize signage if the content relates to a candidate for office outside of the narrow period referenced above.

151. Property owners in Flat Rock may not utilize signage for political speech if the content relates to an issue upon which voters or a legislative body may vote outside of the narrow period referenced above.

152. Property owners in Flat Rock are otherwise required to obtain a permit, which is a costly and difficult process, or not utilize political speech signs outside of the narrow period referenced above.

153. The Sign Control Ordinance also grants a "legislative body" unfettered discretion to limit protected political speech simply by tabling a vote. Upon a legislative body "tabl[ing] a vote"

on an issue, Flat Rock citizens must remove signs from their property within three days. Placing a citizen's freedom of speech in the hands of a legislative body, who may table a vote for the purpose of silencing opposing speech, is unconstitutional.

154. These blanket restrictions on protected speech are substantially overbroad and therefore unconstitutional.

## COUNT III

## Void for Vagueness (All Defendants under 42 U.S.C. § 1983)

155. Plaintiffs re-allege and incorporate by reference each and every allegation contained in the paragraphs above, as if fully set forth herein.

156. Pursuant to the Fourteenth Amendment, a law that impermissibly delegates basic policy matters to law enforcement and fails to provide fair warning of what behavior is prohibited is void for vagueness. *See Hynes v. Mayor and Council of Borough of Oradell*, 425 U.S. 610, 621-22 (1976).

157. The Sign Control Ordinance violates the Due Process Clause of the Fourteenth Amendment, facially and as applied to Plaintiffs, because it fails to provide a meaningful description of what their terms proscribe.

158. Section 603 of the Sign Control Ordinance purports to regulate "[s]igns relating to an issue . . . upon which voters may vote."

159. The phrase "[s]igns relating to an issue . . . upon which voters may vote" fails to provide a meaningful description of what type of signs are regulated by the Sign Control Ordinance.

160. The phrase "[s]igns relating to an issue . . . upon which voters may vote" provides no guidance to courts, police, the sign enforcement officer, or the general public on how to interpret or apply these provisions, which could apply to a nearly limitless number of signs.

161. In the event a citizen of Flat Rock must seek a permit to engage in political speech on her or his own property, the "Sign Enforcement Officer shall have the authority to reject a sign application if, *in his judgment*, the sign would be inconsistent with the objectives of this ordinance and, in particular, preserving the natural beauty of the area" (emphasis added). This provision sets forth no meaningful limits on the Sign Enforcement Officer's discretion.

162. In addition, Article IX, Section 900 of the Sign Ordinance provides the Sign Enforcement Officer unguided discretion for determining when to issue a notice of violation. The provision there simply states the "Sign Enforcement Officer shall have the authority to issue a notice of violation of this ordinance." This section later states "Upon determination that a violation exists, the Sign Enforcement Office shall cause a notice of violation to be issued and served on the violator herein above provided." The Sign Enforcement Officer's obligation to notice a violation is therefore left to her unbounded discretion in "determin[ing] that a violation exists."

163. These provisions and numerous others fail to provide reasonable notice of what conduct is proscribed and to establish minimal guidelines to govern officials' exercise of discretion in implementation and enforcement. The provisions are therefore void for vagueness, violating the Due Process Clause of the Fourteenth Amendment.

## COUNT IV

### Violation of the Equal Protection Clause (All Defendants under 42 U.S.C. § 1983)

164. Plaintiffs re-allege and incorporate each and every allegation contained in the paragraphs above, as if fully set forth herein.

165. The Fourteenth Amendment to the United States Constitution provides no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

166. The passage of amendments to the Sign Control Ordinance on December 13, 2018, and the subsequent Notices of Violation sent to CLG members and other village residents treat CLG, its members, and other like-minded individuals differently from other similarly situated individuals who utilize signage for political speech in violation of the equal protection guarantee of the Fourteenth Amendment.

167. The Sign Control Ordinance was amended based on purposeful discrimination.

168. Transmittal of Notices of Violation to CLG and its members was motivated by purposeful discrimination.

169. Mayor Staton's comments regarding the impetus for the amendments to the Sign Control Ordinance evince a clear and purposeful discrimination against CLG, its members, and its messages.

170. Other signs posted throughout the Village, including that of Village Council member John Dockendorf, were not targeted by amendments to the Sign Control Ordinance or enforcement by the Sign Enforcement Officer, whereas CLG's signs were.

171. There is no rational basis for treating CLG's signs differently than similarly-situated individuals.

172. There is no legitimate state interest in treating CLG's signs differently than similarly-situated individuals.

173. Accordingly, Defendants are liable to CLG and its members under 42 U.S.C. § 1983.

## PRAYER FOR RELIEF

174. Wherefore, Plaintiffs respectfully request that a jury trial be had on all issues so triable by a jury, and the following judgments be entered by this Court in their favor for each and every count and award Plaintiffs relief, including, but not limited to, the following:

(i) An injunction prohibiting Defendants from enforcing the Sign Control Ordinance against Plaintiffs;

(ii) Nominal and/or compensatory damages in an amount to be determined by the finder of fact in accordance with the proof, plus interest at the legal rate until paid;

(iii) Attorneys' fees and costs incurred as a result of prosecution of these claims, with appropriate interest, as provided by 42 U.S.C. § 1988;

(iv) Expert fees and costs as a result of prosecution of these claims, with appropriate interest, as provided by 42 U.S.C. § 1988;

(v) Declaratory judgment that the Sign Control Ordinance is invalid for violating the First and Fourteenth Amendments of the Constitution; and

(vi) Any other relief the Court deems just and proper.

Dated: July 9, 2019

Respectfully submitted,

By: */s/ David G. Guidry*

David G. Guidry
N.C. State Bar No. 38675
MAINSAIL LAWYERS
338 S. Sharon Amity Road, #337
Charlotte, North Carolina 28211
E: dguidry@mainsaillawyers.com
T: 917.376.6098
F. 888.501.9309

*/s/ Mario Mancuso*

Mario Mancuso (Pro Hac forthcoming)
Joshua Browning (Pro Hac forthcoming)
Karam Hijji (Pro Hac forthcoming)
James Yates (Pro Hac forthcoming)
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, NW
Washington, DC 20004
202-389-5000

ATTORNEYS FOR PLAINTIFFS
Cultural Landscape Group: Flat Rock,
Anne Coletta, and Paul Coletta